**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| DESMOND BANKS, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br>v.<br><br>COSTAR REALTY INFORMATION, INC.,<br><br>Defendant. | Case No. 4:25-cv-00564<br><br>Removed from the City of St. Louis Circuit Court, Missouri, Case No. 2522-CC00514 |

**MOTION FOR LEAVE TO FILE NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendant CoStar Realty Information, Inc. ("CoStar"), by and through its undersigned counsel, respectfully moves this Court for an order allowing CoStar to file a notice of supplemental authorities in support of its pending motion to dismiss, which cites court opinions that were issued after briefing closed. In support of this Motion, CoStar states as follows:

1. Plaintiff Desmond Banks ("Plaintiff") filed a Complaint on March 20, 2025, alleging a single cause of action under the Video Privacy Protection Act ("VPPA").

2. On May 23, 2025, CoStar filed a motion to dismiss. (ECF Nos. 13, 14, 15, 23.)

3. Briefing on CoStar's motion was completed on July 7, 2025. (ECF No. 23.)

4. Multiple VPPA cases have been dismissed after briefing closed in this case on the basis that plaintiffs failed to state a claim because they did not allege the disclosure of personally identifiable information. *Nixon v. Pond5, Inc.*, No. 1:24-cv-05823 (JLR) (S.D.N.Y July 21, 2025); *Golden v. NBCUniversal Media, LLC*, No. 22 CIV. 9858 (PAE), 2025 WL 2530689 (S.D.N.Y. Sept. 3, 2025); *Taino v. Bow Tie Cinemas, LLC*, No. 1:23-cv-05371-VSB (S.D.N.Y. Sept. 16,

2025). This is one of the arguments CoStar makes in its pending motion to dismiss. (*See* ECF No. 14 at 6-8; ECF No. 23 at 5-7.)

5. Local Rule 4.01 provides that any additional memorandum may only be filed with leave of court. To the extent that a notice of supplemental authority is considered an additional memorandum, Costar respectfully requests that leave be granted. A copy of the proposed notice of supplemental authorities is attached hereto as **Exhibit 1.**

WHEREFORE, Defendant CoStar Realty Information, Inc. respectfully requests leave to file a notice of supplemental authority.

Dated: September 23, 2025

Respectfully submitted,

By: *\/s/ Bonnie Keane DelGobbo*

Colby M. Everett (#72403 MO)
Baker & Hostetler LLP
1801 California Street, Suite 4400
Denver, CO 80202
(303) 764-4062
ceverett@bakerlaw.com

Bonnie Keane DelGobbo (*pro hac vice*)
Baker & Hostetler LLP
One North Wacker Drive, Suite 3700
Chicago, IL 60606
Tel: (312) 416-6200
Fax: (312) 416-6201
bdelgobbo@bakerlaw.com

*Attorneys for Defendant CoStar Realty Information, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, September 23, 2025, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

*/s/ Bonnie Keane DelGobbo*
*Counsel for CoStar*

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| DESMOND BANKS, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>COSTAR REALTY INFORMATION, INC.,<br><br>Defendant. | Case No. 4:25-cv-00564<br><br>Removed from the City of St. Louis Circuit Court, Missouri, Case No. 2522-CC00514 |

**DEFENDANT COSTAR REALTY INFORMATION, INC.'S [PROPOSED] NOTICE OF SUPPLEMENTAL AUTHORITIES**

Defendant CoStar Realty Information, Inc. ("CoStar"), by and through its undersigned counsel, hereby gives notice of the Opinions and Orders in *Nixon v. Pond5, Inc.*, No. 1:24-cv-05823 (JLR) (S.D.N.Y July 21, 2025); *Golden v. NBCUniversal Media, LLC*, No. 22 CIV. 9858 (PAE), 2025 WL 2530689 (S.D.N.Y. Sept. 3, 2025); and *Taino v. Bow Tie Cinemas, LLC*, No. 1:23-cv-05371-VSB (S.D.N.Y. Sept. 16, 2025) (attached hereto as Exhibits A, B, and C), which support the arguments CoStar makes in its pending Motion to Dismiss (ECF No. 13, 14, 15, 23), and which were issued after briefing closed.

In all three Video Privacy Protection Act ("VPPA") cases, the courts granted the defendants' motions to dismiss, holding that the plaintiffs' allegations concerning website transmissions via the Meta Pixel did not constitute personally identifiable information ("PII") as defined by the VPPA. The courts explained that an ordinary person could not, with little or no extra effort, discern allegedly identifying information contained in jumbled lines of code sent to Meta:

> However, I find that it is implausible that an ordinary person would be able to interpret this code, without Plaintiff's emphases with red boxes, "with little or no extra effort," to identify that this was a movie ticket Plaintiff purchased.
>
> ***
>
> Nor is it plausible that an ordinary person would see the nine-line code of the cookie transmitted— which includes the "c_user" phrase—to cross reference it with the www.facebook.com in the URL section and "conclude that the phrase was a person's FID."

(Exhibit C at *17-18; *see also* Exhibit A at 5 ("While Plaintiffs assert that their FIDs can be identified from the c_user cookie and can thus be used to identify their individual video-watching habits, the Second Circuit has now twice rejected this theory, finding it implausible 'that an ordinary person, without [ ] annotation ..., would see the "c_user" phrase on [this transmission] and conclude that the phrase was a person's FID' or 'use an FID to identify [plaintiff].'"); Exhibit B at *7 ("The FAC does not explain how an ordinary person, "with little or no extra effort," could discern that these strings contained Golden's FID or the titles of videos she had watched. At most, the FAC pleads that *Facebook*—through its proprietary systems—could decode these technical strings. But disclosures comprehensible only to Facebook or other sophisticated actors are not PII.").).)

These opinions support CoStar's argument that the type of information at issue in this case is not PII as defined by the VPPA.

Dated: September 23, 2025

Respectfully submitted,

By: */s/ Bonnie Keane DelGobbo*

Colby M. Everett (#72403 MO)
Baker & Hostetler LLP
1801 California Street, Suite 4400
Denver, CO 80202
(303) 764-4062

ceverett@bakerlaw.com

Bonnie Keane DelGobbo (*pro hac vice*)
Baker & Hostetler LLP
One North Wacker Drive, Suite 3700
Chicago, IL 60606
Tel: (312) 416-6200
Fax: (312) 416-6201
bdelgobbo@bakerlaw.com

*Attorneys for Defendant CoStar Realty Information, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, September 22, 2025, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

*/s/ Bonnie Keane DelGobbo*
*Counsel for CoStar*

# EXHIBIT A

2025 WL 2030303
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

MATTHEW NIXON and PETER FLEMING, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
POND5, INC., Defendant.

Case No. 1:24-cv-05823 (JLR)
|
Filed 07/21/2025

**OPINION AND ORDER**

JENNIFER L. ROCHON United States District Judge

***1** Matthew Nixon and Peter Fleming (together, "Plaintiffs") bring claims on behalf of a putative class against Defendant Pond5, Inc. ("Pond5"), a stock-video seller, under the Video Privacy Protection Act (VPPA), 18 U.S.C. § 2710. Dkt. 1 ("Compl."). Pond5 moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) and Rule 12(b)(6). Dkt. 16. For the reasons that follow, the Court GRANTS the motion to dismiss.

## BACKGROUND [1]

1 Unless otherwise noted, the following facts are drawn from the Complaint, which the Court "constru[es] ... liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113 (2d Cir. 2023) (quoting *Miller v. Metro Life Ins. Co.*, 979 F.3d 118, 121 (2d Cir. 2020)).

### I. Factual Allegations

Pond5 is a stock-video seller and operates a service by which its users can purchase and download prerecorded videos. Compl. ¶¶ 3, 16. On Pond5's website, www.pond5.com, customers can choose from over 42 million prerecorded videos to watch, purchase (either individually or through a subscription), and download. Compl. ¶¶ 17-18. The price for individual prerecorded videos begins at $25, but Pond5 also offers a monthly subscription for $199 per month or an annual subscription for $999 per year. Compl. ¶ 17.

Meta, the company that operates Facebook and Instagram, offers advertisers the option to use certain business tools to gather information about Facebook users to better target advertising. Compl. ¶¶ 24-25, 27-28. One such tool is the Meta Tracking Pixel (the "Pixel"), "a piece of code that advertisers ... can integrate into their website[s]." Compl. ¶¶ 28-29. Once activated, the Pixel tracks users and the types of actions they take, including what content a visitor views or purchases. Compl. ¶¶ 29-30. When the Pixel captures an action, it sends a record to Facebook, which processes, analyzes, and assimilates the information into datasets for use in targeted advertising. Compl. ¶ 29.

Pond5 implemented the Pixel in or about February 2018, and continues to use it. Compl. ¶¶ 21, 33. Plaintiffs allege that Pond5 tracks, collects, and discloses its customers' and subscribers' information through the Pixel without their knowledge or consent. Compl. ¶¶ 4-5. Plaintiffs allege that when they visited Pond5's website, the Pixel "automatically caused" their personal identifiers, including "c_user," "fr," and "datr" cookies, to be sent to Meta, along with the fact that Plaintiffs visited the website and the titles of the videos they viewed. Compl. ¶ 34. The "c_user" cookie contains a visitor's unencrypted Facebook ID ("FID"), which can be used to find their Facebook accounts. Compl. ¶¶ 41-42. A "fr" cookie contains a visitor's encrypted FID and a browser identifier. Compl. ¶ 45. The "datr" cookie also contains a browser identifier. Compl. ¶ 45.

The Pixel transmits information associated with two distinct events, the "PageView" and "Purchase" events, to Facebook. Compl. ¶ 36. The PageView event occurs when a subscriber views a prerecorded video, while the Purchase event occurs when a subscriber or customer purchases and downloads a prerecorded video. Compl. ¶¶ 37-39. In both events, the Pixel transmits the URL and title of the video to Facebook. Compl. ¶¶ 37-40. If a visitor to Pond5's website has not logged out of Facebook when they visit Pond5's website, the Pixel transmits the "c_user," "fr," and "datr" cookies to Facebook. Compl. ¶¶ 41-42, 41 fig. 4. When a visitor has recently logged out of Facebook, the Pixel transmits the "datr" and "fr" cookies, but not the "c_user" cookie. Compl. ¶¶ 44-45, 44 fig. 5.

***2** In or about September 2021, Plaintiff Matthew Nixon purchased two stock videos from Pond5. Compl. ¶ 7. In or about October 2020, Plaintiff Peter Fleming purchased

stock videos from Pond5. Compl. ¶ 8. Throughout the time that Fleming and Nixon viewed and downloaded videos on Pond5's website, they had Facebook and/or Instagram accounts and used one of those accounts during that period. Compl. ¶¶ 7-8. Nixon did not discover that Pond5 had collected and transmitted his FID and browser identifiers, along with the videos and titles of videos he viewed, to Meta until July 8, 2024. Compl. ¶¶ 52-53. Similarly, Fleming did not discover that Pond5 had collected and transmitted his FID and browser identifiers, along with the videos and titles of videos he viewed, until July 10, 2024. Compl. ¶¶ 52-53, 58-59.

### II. Procedural History

Plaintiffs filed this suit on July 31, 2024. *See generally* Compl. Pond5 moved to dismiss on September 20, 2024. Dkt. 16; Dkt. 17 ("Br."); Dkt. 18 ("McPherson Decl."); Dkts. 18-1 to 18-16. Plaintiffs filed their opposition on November 1, 2024, Dkt. 20 ("Opp."), and Pond5 filed its reply on November 22, 2024, Dkt. 21 ("Reply"). Pond5 filed notices of supplemental authority on May 5, 2025 and June 24, 2025. Dkts. 22, 23. The motion is thus fully briefed. [2]

2 Pond5 requested oral argument via notation on its motion. The Court declines this request because the parties' briefing was sufficient and oral argument would not materially assist the Court. *See Dotson v. Griesa*, 398 F.3d 156, 159 (2d Cir. 2005) ("[A] district court acts well within its discretion in deciding dispositive motions on the parties' written submissions without oral argument.").

## LEGAL STANDARDS

To survive a Rule 12(b)(1) motion to dismiss, " 'the plaintiff must clearly allege facts [in his complaint] demonstrating each element' of standing," *Lugo v. City of Troy*, 114 F.4th 80, 87 (2d Cir. 2024) (alteration in original) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)), and "the complaint's factual allegations of standing must be 'plausible' and 'nonconclusory,' " *id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 680 (2009)). "In assessing whether there is subject matter jurisdiction, the Court must accept as true all material facts alleged in the complaint, but 'the court may resolve [any] disputed jurisdictional fact issues by referring to evidence outside of the pleadings.' " *Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 254 (S.D.N.Y. 2018) (alteration in original) (citation omitted) (quoting *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000)).

Under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc) (quoting *Iqbal*, 556 U.S. at 678). The court draws all reasonable inferences in the plaintiff's favor and accepts as true all nonconclusory allegations of fact. *Id.* However, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 557 (2007)). Determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## DISCUSSION

Pond5 moves to dismiss for lack of standing under Rule 12(b)(1) and for failure to state a claim under the VPPA, pursuant to Rule 12(b)(6). Br. at 7, 10. The Court begins with Pond5's Rule 12(b)(1) motion. *See Daly v. Citigroup Inc.*, 939 F.3d 415, 426 (2d Cir. 2019) (where defendants move to dismiss under Rules 12(b)(1) and 12(b)(6), the court "consider[s] the Rule 12(b)(1) challenge first since 'if [the court] must dismiss the complaint for lack of subject matter jurisdiction, the [defendants'] defenses and objections become moot and do not need to be determined' " (quoting *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990))); *Narcisse v. Progressive Cas. Ins. Co.*, --- F. Supp. 3d ---, 2025 WL 1114855, at *4 (S.D.N.Y. Apr. 15, 2025) (resolving Rule 12(b)(1) motion to dismiss for lack of standing before Rule 12(b)(6) motion to dismiss for failure to state a claim).

### I. Standing

***3** Pond5 moves to dismiss Plaintiffs' claim for lack of subject matter jurisdiction, arguing that Plaintiffs lack standing because they have not suffered a concrete injury. Br. at 7-10.

To demonstrate standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct.

2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). In cases involving statutory violations, Article III's injury-in-fact requirement means that "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court.' " *Id.* at 2205. "To allege a concrete harm, a plaintiff must point to 'a close historical or common-law analogue for their asserted injury,' " but "need not present an 'exact duplicate.' " *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 541 (2d Cir. 2024) (quoting *TransUnion*, 141 S. Ct. at 2204, 2209). Instead, "what matters is 'whether the alleged injury to the plaintiff has a "close relationship" to a harm "traditionally" recognized as providing a basis for a lawsuit in American courts.' " *Packer ex rel. 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 52 (2d Cir. 2024) (quoting *TransUnion*, 141 S. Ct. at 2204).

Pond5 argues that the Complaint fails to allege an injury in fact because Plaintiffs' injury does not bear a close relationship to "a harm traditionally recognized as providing a basis for a lawsuit in American courts," *TransUnion*, 141 S. Ct. at 2200. *See* Br. at 8-9. The Court is not persuaded.

In *Salazar*, the Second Circuit held that the plaintiff, who alleged "that his personally identifiable information was exposed to an unauthorized third party" in violation of the VPPA "as a result of an arrangement between the [defendant] and Meta pursuant to which the [defendant] deliberately use[d] the Facebook Pixel," was "sufficiently concrete" since the alleged harm was closely related to the traditional common-law claim for public disclosure of private facts. 118 F.4th at 542. Plaintiffs here have similarly alleged that Pond5 disclosed their private viewing information (the titles of the Pond5 videos they downloaded and watched) to a third party, Meta, without their consent. Compl. ¶¶ 81-84. Pond5 argues that the facts of this case differ from those in *Salazar* because Pond5's stock videos are designed to be redisplayed to the public and so any disclosure of the videos viewed do not involve private information. Reply at 1-4. But the fact that Pond5 sells stock videos and offers commercial licenses for those videos does not make Plaintiffs' viewing history public, particularly given that the claims are not based on allegations that Plaintiffs displayed the downloaded videos to the public; rather, the claims concern the downloading of those videos by Plaintiffs. As in *Salazar*, the fact that Meta could leverage Plaintiffs' personal viewing or downloading information for "its own commercial purposes" (showing the user targeted ads) renders the harm alleged sufficiently similar to "the public disclosure of private facts common-law analog." 118 F.4th at 543-44. That harm still exists even if Plaintiffs may one day use Pond5's videos publicly. Since Pond5 has not offered any persuasive reason why this case meaningfully differs from the facts at issue in *Salazar*, the Court finds that Plaintiffs have adequately pleaded a concrete injury sufficient to withstand dismissal under Rule 12(b)(1). [3]

3 Pond5's attempt to analogize Plaintiffs' viewing to the facts of *Osheske v. Silver Cinemas Acquisition Co.*, 700 F. Supp. 3d 921 (C.D. Cal. 2023), *aff'd*, 132 F.4th 1110 (9th Cir. 2025), is unpersuasive, since that case did not address standing and instead held that a movie theater defendant was not covered by the VPPA because it was not a "video tape service provider." *Id.* at 927-28. Pond5 has now withdrawn its argument that it is not a videotape service provider in light of *Salazar*. Reply at 6. Similarly, the Court is unmoved by Pond5's citation to a series of cases, all involving Fourth Amendment claims (or its state-constitution equivalent) in the criminal context, holding that individuals lack a privacy interest in information they post on public websites, *see* Br. at 9-10, given the differing factual and statutory context here.

***4** Pond5 does not otherwise argue that Plaintiffs have failed to plead facts that satisfy Article III's other standing requirements. The Court is satisfied that the alleged injury, the disclosure of Plaintiffs' personal viewing information to a third party without their consent, is particularized and actual, that the injury is traceable to Pond5's installation of the Pixel on its website, and that Plaintiffs' requested injunctive and monetary relief would redress their injuries. *See Salazar*, 118 F.4th at 544 (similar).

Since Plaintiffs have alleged facts that satisfy Article III standing, the Court denies Pond5's motion to dismiss under Rule 12(b)(1).

### II. The VPPA Claim

Plaintiffs allege that Pond5 disclosed their personally identifiable information to Meta and other unauthorized third parties through the Meta Tracking Pixel in violation of the VPPA. Compl. ¶¶ 77-86. Pond5 moves to dismiss this claim, arguing that Plaintiffs have failed to state a claim under the VPPA.

The VPPA provides that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable

information concerning any consumer of such provider shall be liable to the aggrieved person." 18 U.S.C. § 2710(b)(1). "To state a claim under the VPPA, a plaintiff must plausibly allege that (1) a video tape service provider (2) knowingly disclosed to any person (3) personally identifiable information concerning her use of the service." *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 44 (2d Cir. 2025).

Pond5 argues that Plaintiffs' claims should be dismissed because (1) they are time-barred, Br. at 11-15, (2) Plaintiffs do not allege disclosure of personally identifiable information, *id.* at 18-20 and (3) Plaintiffs consented to Pond5's use of the Meta Tracking Pixel and its alleged disclosure of personally identifiable information, *id.* at 20-22. [4] The Court need only address Pond5's second argument, that Plaintiffs have failed to state a claim because they have not alleged the disclosure of personally identifiable information.

4 Pond5 also initially argued that the Complaint should be dismissed because Pond5 is not a video tape service provider within the meaning of the VPPA, Br. at 15-18, but has withdrawn this argument in light of the Second Circuit's contrary holding in *Salazar*, Reply at 6; *Salazar*, 118 F.4th at 549. The Court thus does not address this argument.

The VPPA defines "personally identifiable information" as "includ[ing] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The Courts of Appeals have diverged in their interpretation of this term. The First Circuit has adopted a "reasonable foreseeability" standard, holding that "personally identifiable information is 'not limited to information that explicitly names a person,' but also includes information disclosed to a third party that is 'reasonably and foreseeably likely to reveal which ... videos [the plaintiff] has obtained.' " *Solomon*, 136 F.4th at 49 (alteration in original) (quoting *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016)). Meanwhile, the Third and Ninth Circuits have adopted the "ordinary person" standard, holding that personally identifiable information is limited to "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 267 (3d Cir. 2016); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (adopting ordinary person standard)

***5** Recently, in *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, the Second Circuit adopted the "ordinary person" standard and held that " 'personally identifiable information' encompasses information that would allow an ordinary person to identify a consumer's video-watching habits, but not information that only a sophisticated technology company could use to do so." *Solomon*, 136 F.4th at 52. Thus, to survive a motion to dismiss, plaintiffs must "plausibly allege[ ] that [the defendant's] disclosure of [information] 'would, with little or no extra effort, permit an ordinary recipient to identify [the plaintiff's] video-watching habits.' " *Id.* at 54 (quoting *In re Nickelodeon*, 827 F.3d at 284).

After adopting the ordinary person standard, the Second Circuit rejected Pixel-based VPPA claims on the ground that such claims do not plausibly allege the disclosure of personally identifiable information. *See Solomon*, 136 F.4th at 54-55. In *Solomon*, as here, the plaintiff brought a VPPA claim against a defendant that had installed the Pixel on its website. *See id.* at 54. Among other things, the Second Circuit found that the complaint did not "plausibly allege that an ordinary person could identify [the plaintiff] through her FID," since an ordinary person would not see the "c_user" cookie and the corresponding string of letters "and conclude that the phrase was a person's FID." *Id.*; *see also In re Nickelodeon*, 827 F.3d at 283 ("To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person."). Shortly thereafter, in *Hughes v. National Football League*, No. 24-2656, 2025 WL 1720295, (2d Cir. June 20, 2025) (summary order), the Second Circuit affirmed the dismissal of another VPPA action on this basis, even though the district court had not addressed it. *Id.* at *2. The Second Circuit declared that "*Solomon* effectively shut the door for Pixel-based VPPA claims." *Hughes*, 2025 WL 1720295, at *2; *see id.* at *3 (rejecting the argument that "a viewer's FID can be identified based on the string of numerals following the 'c_user' field" since it was "not plausible that an ordinary person, without [ ] annotation ..., would see the 'c_user' phrase on [this communication] and conclude that the phrase was a person's FID" (alterations and omission in original) (quoting *Solomon*, 136 F.4th at 54)).

Plaintiffs' allegations mirror those found insufficient in *Salazar* and *Hughes*. Here too, Plaintiff alleges that "the Meta Pixel automatically caused the Plaintiffs' ... personal identifiers, including the c_user, _fr, and datr cookies, to be transmitted to Meta, attached to the fact that the Plaintiffs ... had viewed the website and the titles of the videos the Plaintiffs ... viewed." Compl. ¶ 34. Like the plaintiffs in

*Hughes* and *Solomon*, Plaintiffs include screenshots depicting the information sent to Meta from a visitor's browser by the Meta Tracking Pixel when a visitor watches or downloads a video on Pond5's website:

Tabular or graphical material not displayable at this time.

Compl. ¶ 41 fig. 4 (arrow identifying redacted FID); *see also id.* ¶ 44 fig. 5; *Hughes*, 2025 WL 1720295, at *2; *Solomon*, 136 F.4th at 46. While Plaintiffs assert that their FIDs can be identified from the c_user cookie and can thus be used to identify their individual video-watching habits, Opp. at 16, the Second Circuit has now twice rejected this theory, finding it implausible "that an ordinary person, without [ ] annotation ..., would see the 'c_user' phrase on [this transmission] and conclude that the phrase was a person's FID" or "use an FID to identify [plaintiff]." *Solomon*, 136 F.4th at 54; *see also Hughes*, 2025 WL 1720295, at *3 (same). Since an ordinary person would not plausibly be able to identify Plaintiffs' video-watching habits as a result of the Pixel transmissions, Plaintiffs have not plausibly alleged that Pond5 disclosed "personally identifiable information" in violation of the VPPA. The Court thus grants the motion to dismiss.

### III. Leave to Amend

***6** Plaintiffs briefly request leave to amend should the Court grant the motion to dismiss. Opp. at 20-21. Rule 15 provides that courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); *accord Rejuvenating Fertility Ctr., PLLC v. TD Bank, N.A.*, No. 23-cv-05973 (JLR), 2025 WL 588570, at *7 (S.D.N.Y. Feb. 24, 2025) (same). "Nonetheless, 'it is within the sound discretion of the district court to grant or deny leave to amend,' and 'a district court may properly deny leave when amendment would be futile.' " *Veras v. N.Y.C. Dep't of Educ.*, No. 22-cv-00056 (JLR) (SN), 2024 WL 3446498, at *8 (S.D.N.Y. July 17, 2024) (first quoting *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018); and then quoting *Jones v. N.Y. State Div. of Mil. & Naval Affs.*, 166 F.3d 45, 50 (2d Cir. 1999)). "[T]he standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss." *Carroll v. Trump*, 590 F. Supp. 3d 575, 579 (S.D.N.Y. 2022) (quoting *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015)).

The Court denies leave to amend in light of *Hughes*. In *Hughes*, the Second Circuit rejected the plaintiff's request to vacate and remand so that he could amend his complaint to include greater detail about his Pixel-based VPPA claims, namely that "(1) Facebook receives communications from the Pixel 'in a way that is automatically translated into a readable format and is displayed (or is displayable) on a user interface as plain text'; (2) an ordinary person could plug the code into 'ubiquitous internet-based tools like ChatGPT' to 'translate the code to reveal the Facebook ID and video title in plain English'; and (3) 75% of Americans have a Facebook account." 2025 WL 1720295, at *3 (citation omitted). The Second Circuit found that "amendment would likely be futile" in light of *Solomon*, since none of the plaintiff's proposed allegations made it plausible that "an ordinary person would be able to understand the actual underlying code communication itself." *Id.*

Here, Plaintiffs do not offer any insight into how they would amend their Complaint if given the opportunity, *see* Opp. at 20-21, nor have they provided any such details following the Second Circuit's decisions in *Solomon* and *Hughes*. Thus, the Court concludes that leave to amend would be futile. *See Gregory v. ProNAi Therapeutics Inc.*, 757 F. App'x 35, 39 (2d Cir. 2018) (summary order) (affirming denial of leave to amend where plaintiffs sought leave to amend only briefly at the end of their opposition to defendants' motion to dismiss and "included no proposed amendments"); *Hughes*, 2025 WL 1720295, at *3 (despite plaintiff's requests to add greater detail about his Pixel-based claims, explaining that there was "no basis for remanding because amendment would likely be futile"). Plaintiffs' request for leave to amend is DENIED.

## CONCLUSION

For the foregoing reasons, the Court DENIES Pond5's motion to dismiss pursuant to Rule 12(b)(1), but GRANTS its motion to dismiss pursuant to Rule 12(b)(6). Plaintiffs' request for leave to amend is DENIED. The Complaint is dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the motion at Dkt. 16 and close the case.

SO ORDERED.

### All Citations

Slip Copy, 2025 WL 2030303

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2025 WL 2530689
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

SHERHONDA GOLDEN, individually and on behalf of all others similarly situated, Plaintiff,
v.
NBCUNIVERSAL MEDIA, LLC, Defendant.

22 Civ. 9858 (PAE)
|
Filed 09/03/2025

OPINION & ORDER

Paul A. Engelmayer United States District Judge

***1** Plaintiff Sherhonda Golden brings this putative class action against NBCUniversal Media, LLC ("NBCU"), claiming violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), and unjust enrichment. Golden claims that NBCU knowingly disclosed to Meta Platforms, Inc. ("Facebook")—the parent company of popular social media service Facebook—personally identifiable information ("PII") about Golden and other digital visitors to Today.com ("users"), and also information about their video consumption. This information, which Golden contends was disclosed without users' consent, was allegedly transmitted through the Facebook Pixel, a functional software code that collects users' data. The data consisted of (1) a sequence of characters, letters, and numbers which, when interpreted, would identify the user's video title and uniform resource locator ("URL" or web address), and (2) the user's Facebook identification number ("FID" or "Facebook ID"), a unique sequence of numbers linked to the user's Facebook profile.

This case has a complex history, as reflected in the fact that the complaint that NBCU now moves to dismiss is Golden's Fourth Amended Complaint. In November 2022, Golden filed her first complaint. Dkt. 1. In August 2023, the Court dismissed her First Amended Complaint, holding that Golden had not plausibly alleged her consumer status under the VPPA. Dkt. 34 ("2023 Decision"). But the Court granted Golden leave to amend to add factual allegations as to the operation of NBCU's mobile app and email newsletter. *See id.* at 26. Golden eventually filed the Third Amended Complaint, Dkt. 38 ("TAC"),[1] which the Court dismissed under Federal Rule of Civil Procedure 12(b)(6), finding that Golden's receipt of a non-video email newsletter did not make her a "consumer" under the VPPA, Dkt. 44 ("September 2024 Decision"). In dismissing, however, the Court noted that an appeal was pending in *Salazar v. National Basketball Association*, 685 F. Supp. 3d 232 (S.D.N.Y. 2023) ("*Salazar I*"), which this Court had cited in dismissing. *See* September 2024 Decision at 13 n.7. The Court stated that "[i]n the event the Second Circuit resolves *Salazar* in a manner inconsistent with this decision, Golden may ... seek an indicative ruling from this Court under Rule 62.1." *Id.*

1 On September 7, 2023, Golden filed a Second Amended Complaint. Dkt. 35. In September 2023, after the parties conferred, Golden, with NBCU's consent, filed the TAC. Dkt. 38.

Golden appealed. While her appeal was pending, the Circuit issued *Salazar v. National Basketball Association*, 118 F.4th 533 (2d Cir. 2024) ("*Salazar II*"). It held, contrary to a premise of the September 2024 Decision, that a subscription to a digital newsletter linked to video content could establish "consumer" status under the VPPA. *Id.* at 544. This Court then issued an indicative ruling to the effect that, if remanded, it would deny NBCU's motion to dismiss Golden's VPPA claim on the basis of *Salazar II.* Dkt. 51 ("November 2024 Ruling"). Golden then moved to dismiss her appeal and remand to this Court, which the Second Circuit granted. *See* Dkt. 52.

***2** Golden thereupon amended and filed the Fourth Amended Complaint, the operative complaint today. *See* Dkt. 56 ("FAC"). NBCU now moves anew to dismiss the FAC, on a ground not previously litigated. For the reasons that follow, the Court grants NBCU's motion.

## I. Factual Background[2]

2 The following facts are drawn primarily from the FAC. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

plaintiff. *See* Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012).

The Court incorporates by reference the facts recounted in its earlier decisions. The following summary focuses on the factual allegations—including those added by the FAC—necessary to resolve the limited issue presented.

**A. Today.com's Website and Newsletter**

NBCU owns and operates Today.com, a website accessible from a desktop computer or a mobile app. FAC ¶¶ 1, 4. Today.com offers both live and on-demand video content.

The website also allows users to "sign up" for a daily digital newsletter. *Id.* ¶ 42. Today.com directs users who wish to sign up for the newsletter to enter an email address and click "sign up." *Id.* As an illustration, the FAC presents the following screenshot that users, interested in signing up for a newsletter, would have seen on November 18, 2022:

Tabular or graphical material not displayable at this time.

*Id.* Newsletter recipients provide NBCU with their internet protocol ("IP") address, a unique number assigned to all information technology connected devices, which conveys to NBCU the device's city, zip code, and physical location. *Id.* ¶ 49.

Once a user signs up, a daily digital newsletter is delivered to the email address that the user provided to Today.com. The newsletters contain hyperlinks to "web-hosted audio visual content, exclusive content, and direct, prominently featured links to audio visual content on Today.com." *Id.* ¶ 53.

The FAC contains an excerpt of a screenshot of a "This is Today" daily digital newsletter from September 6, 2023 that would have been sent to a user's email address:

Tabular or graphical material not displayable at this time.

*Id.* ¶ 43. Today.com notifies users who have signed up for a daily newsletter that they can: (1) refer a friend to "subscribe here"; (2) manage their "subscriptions"; and (3) "unsubscribe" from their subscription to the newsletter. *Id.* ¶ 44.

Today.com permits users to sign up for multiple daily digital newsletters. These include ones entitled: This is TODAY; Start TODAY; Stuff We Love; TODAY On the Show; TODAY Food; TODAY Parents; Read with Jenna; and Concert Series Alerts, Show Updates, Special Events & Offers. *Id.* ¶ 45. NBCU offers these daily newsletters "with the goal of building an ongoing relationship with its subscribers ... by having direct access to and delivering content to each subscriber's inbox." *Id.* ¶ 46. These daily digital newspapers also "drive interactions with [NBCU's] own website and video content." *Id.*

**B. Facebook Pixel**

***3** As of May 2025, Today.com's privacy policy states that it automatically collects certain information—including "content you view and duration." *Id.* ¶ 57.[3] But the policy does not disclose that Today.com shares that information with third parties, including, as relevant here, Facebook. *Id.* ¶ 59.

3 NBCU updated its privacy policy on December 16, 2022, approximately one month after Golden filed this lawsuit. *Id.* ¶ 57 n.2.

Today.com installed Facebook's tracking pixel (the "Pixel") to transmit certain information about users to Facebook, which Facebook then uses to target ads for particular users. *Id.* ¶ 61. The Pixel tracks users' actions on Facebook advertisers' websites and reports these to Facebook. *Id.* ¶ 78. The website advertiser informs Facebook which website events it wishes to track. *Id.* Facebook, in turn, generates corresponding pixel code for the advertiser to include in the code of its website. *Id.* Thus, when a digital newsletter recipient watches video content, Today.com transmits to Facebook a cookie[4] with the video content name, the URL of the prerecorded video that was viewed, and, for visitors with an active and logged in Facebook account, the viewer's Facebook ID. *Id.* ¶¶ 80–81. An FID is a unique and persistent identifier Facebook assigns to each Facebook user. *Id.* ¶ 81. Any "ordinary user" can use an FID to look up a Facebook profile, "thereby identifying the person who watched the video and revealing any public details displayed on that profile," such as photos, posts, location, occupation, spouse, and education. *Id.* ¶ 95.

4 A cookie is "a small file or part of a file stored on a World Wide Web user's computer, created and subsequently read by a website server, and containing personal information (such as a user identification code, customized preferences, or a record of pages visited)." *Cookie*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/cookie.

When installing the Facebook Pixel, "[d]evelopers and marketers can *optionally choose* to send additional information about the visit through Custom Data events." *Id.* ¶ 83 (emphasis in original). The FAC alleges that NBCU programmed the Pixel to transmit, to Facebook, users' PII and their video viewing history. *Id.* (NBCU declined to program website or app so as not to transmit user information); *id.* ¶ 81 (NBCU installed Pixel so that Facebook received video content name, URL, and user's FID).

As a result of the Pixel installation, when users have clicked on hyperlinks on the daily digital newsletter to view video content on Today.com, the Pixel has transmitted to Facebook "the content name of the URL, which identifies: (1) that there was a video on the page; (2) the video was 'watched;' (3) an identifier for the video content; and (4) the subscriber's FID." *Id.* ¶ 106. As an illustration, the FAC reproduces this screenshot of the computer code transmission sent to Facebook via the Pixel:

Tabular or graphical material not displayable at this time.

*Id.* ¶ 106. The screenshot depicts a video URL path (*e.g.*, the line of code after ":path:" that contains the text "2Fvideo%2Fthe-line-to-pay-respects-to-queen-elizabeth-wraps-around-london"), which "reveals the video name [and] URL." *Id.* It also depicts a cookie value (*e.g.*, the line of code after "cookie:" that contains the text "c_user=100003190670927") that reveals "the viewer's FID."[5] *Id.*

5 The phrase "c_user=" is followed by a string of numbers comprising the user's FID. *Id.* ¶ 90.

***4** The Pixel transmits users' information without their consent or knowledge. *Id.* ¶ 103. NBCU benefits financially from providing this information to Facebook. *Id.* ¶ 127.

### C. Golden's Experience

In 2022, Golden signed up to receive a Today.com newsletter. *Id.* ¶ 114. She has since received emails and other communications from Today.com. *Id.* Golden has accessed audio-visual content via hyperlinks provided in the daily digital newsletters. *Id.* ¶ 115. She has also accessed Today.com's content through its website and mobile app. *Id.* ¶ 118.

Golden has had a Facebook account since approximately 2012, *Id.* ¶ 116. During the period relevant here, she has used her Today.com subscription to view videos through Today.com or its mobile app while concurrently logged into her Facebook account. *Id.* ¶¶ 122–23. Golden never agreed, authorized, or otherwise consented to NBCU's disclosure of her personal video viewing information to Facebook, and has not been given written notice stating that it is NBCU's practice to do so. *Id.* ¶ 124.

## II. Procedural History

On November 18, 2022, Golden filed an initial Complaint. Dkt. 1. On January 27, 2023, NBCU moved to dismiss under Rule 12(b)(6). Dkt. 8. On February 17, 2023, after the Court issued an amend-or-oppose order, Dkt. 13, Golden filed the First Amended Complaint, on behalf of a putative class, bringing VPPA and unjust enrichment claims, Dkt. 14. On March 10, 2023, NBCU moved to dismiss. Dkt, 15. On August 23, 2023, the Court issued the 2023 Decision dismissing the First Amended Complaint, finding that it had not pled that Golden was a "subscriber" within the meaning of the VPPA, without prejudice to Golden's right to amend to add allegations regarding the operation of Today.com's mobile app and email newsletter, which might buttress its claim that Golden qualified as a VPPA subscriber, Dkt. 34.

On September 14, 2023, Golden filed the Third Amended Complaint ("TAC"). Dkt. 38. On September 21, 2023, NBCU moved to dismiss the TAC under Rule 12(b)(6). Dkt. 40. On September 11, 2024, the Court granted NBCU's motion to dismiss. Dkt. 44.

On October 4, 2024, Golden appealed. *See* Dkt. 46. While her appeal was pending, the Second Circuit decided *Salazar II*, holding that newsletter subscribers can be VPPA "consumers." 118 F.4th at 550–53. On November 27, 2024, this Court issued an indicative ruling that, were the case remanded, it would deny NBCU's motion to dismiss. Dkt. 51, On January 3, 2025, the Second Circuit dismissed Golden's appeal and remanded. *See* Dkt. 52.

On May 9, 2025, Golden, with the Court's permission, *see* Dkt. 55, amended and filed the FAC, the operative complaint, Dkt. 56. On June 5, 2025, NBCU moved to dismiss the FAC, Dkt. 57, on a different ground—that the FAC does not adequately allege that NBCU disclosed Golden's PII under the VPPA—and filed a memorandum of law, Dkt. 58 ("Def. Br."), and declaration, Dkt. 59, in support. On June 27, 2025, Golden opposed. Dkt. 62 ("Pl. Opp."). On July 17, 2025, NBCU replied. Dkt. 65 ("Def. Reply"). On August 1 and 22, 2025, Golden filed notices of supplemental authority. Dkts.

66, 68. On August 7 and 29, 2025, NBCU replied. Dkts. 67, 69.

### III. Applicable Legal Standards

***5** To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145; *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party."). That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### IV. Discussion

On NBCU's earlier motions to dismiss, the decisive issue was whether Golden had plausibly pled that she was "a subscriber of goods and services," and thus a "consumer" within the VPPA's meaning. In light of *Salazar II*, the Court held (and NBCU no longer appears to dispute) that Golden's TAC adequately so pled. *See* November 2024 Ruling at 2–3. The FAC, the operative pleading today, reprises the allegations that Golden subscribed to Today.com's digital newsletters, which provided hyperlinks to video content. *See, e.g.*, FAC ¶¶ 121–23. Under *Salazar II*, that subscription makes Golden a consumer. *See*118 F.4th at 549–50.

NBCU's current motion to dismiss presses a different point. It argues that the FAC does not adequately allege that NBCU disclosed Golden's PII within the meaning of the VPPA.

The FAC undisputedly alleges that NBCU, through the Facebook Pixel, transmitted Golden's URL, FID, and video-watching history. *See, e.g.*, FAC ¶¶ 81, 100. Its basis for claiming that NBCU disclosed Golden's PII is that an FID uniquely identifies a Facebook user. *See id.* ¶¶ 12, 119. In moving to dismiss, NBCU, relying on the Second Circuit's recent decision construing the VPPA in *Solomon v. Flipps Media, Inc.*, 136 F.4th 41 (2d Cir. 2025), counters that the FAC does not allege an actionable disclosure of PII. Def. Br. at 1–2, 7–16. NBCU is correct.

#### A. VPPA Claim

The VPPA was enacted in 1988 after a newspaper profile disclosed the video rental history of Supreme Court nominee Robert Bork. *See Salazar II*, 118 F.4th 544–45 (citing S. Rep. No. 100-599, at 5–6 (1988)). Seeking to "preserve personal privacy with respect to the rental, purchase, or delivery of video tapes or similar audio visual materials," the VPPA creates a private right of action for consumers to sue video tape service providers who disclose personally identifiable information about the consumers' video-watching habits. *Id.* at 545 (quoting S. 2361, 100th Cong. (1988)). Under the Act, "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person[.]" 18 U.S.C. § 2710(b)(1). As further defined by the Act,

> (1) "consumer" means any renter, purchaser, or subscriber of goods or services from a video tape service provider; ...
>
> (3) "personally identifiable information" includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider; and
>
> (4) "video tape service provider" means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]

***6** *Id.* § 2710(a). Salient here, PII, under the VPPA, has three distinct elements: (1) the consumer's identity, (2) the video material's identity, and (3) the connection between them. *Id.* It "constitutes more than just information that identifies an individual, but also information that can be *used* to identify an individual." *Solomon*, 136 F.4th at 48 (collecting cases) (emphasis in original).

The courts of appeals have diverged in interpreting PII under the statute. The First Circuit has adopted a "reasonable foreseeability" standard. It has held that PII is "not limited to

information that explicitly names a person," but also includes information disclosed to a third party that is "reasonably and foreseeably likely to reveal which ... videos [the plaintiff] has obtained." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). In contrast, the Third and Ninth Circuits—and, now, the Second, in *Solomon*—have adopted the "ordinary person" standard. It limits personally identifiable information to "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 267 (3d Cir. 2016) (adopting ordinary person standard); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (same); *Solomon*, 136 F.4th at 51–52 (same).

In adopting the ordinary person standard in *Solomon*, the Second Circuit rejected a materially identical VPPA claim to the one here—that a Facebook Pixel had disclosed a video user's FID and video URLs to Facebook. *Id.* at 54–55. The Circuit held that PII "encompasses information that would allow an ordinary person to identify a consumer's video-watching habits, *but not information that only a sophisticated technology company could use to do so*." *Id.* at 52 (emphasis added). Therefore, it held, to survive a motion to dismiss, a complaint must "plausibly allege[ ] that [the defendant's] disclosure of [information] 'would, with little or no extra effort, permit an ordinary recipient to identify [the plaintiff's] video-watching habits.' " *Id.* at 54 (quoting *In re Nickelodeon*, 827 F.3d at 284). In *Solomon*, the complaint reproduced an exemplar screenshot with several lines of computer code, interspersed with characters, numbers, and letters, which it contended represented an actionable disclosure of PII. *Id.* The Circuit rejected that claim. It found "implausible that an ordinary person would look at [that code] ... and understand it" to reveal a video title or the plaintiff's FID, as opposed to "just one phrase embedded in many other lines of code." *Id.* And, the Circuit noted, the complaint "lack[ed] any details about how an ordinary person might access the information on the Pixel's PageView," or "any details about *how* an ordinary person would use an FID to identify [plaintiff]." *Id.* (emphasis in original); *see In re Nickelodeon*, 827 F.3d at 283 ("To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person."). In short, because the alleged disclosure could not be appreciated—decoded to reveal the actual identity of the user, and his or her video selections—by an ordinary person but only by a technology company such as Facebook, it did not amount to PII. *Solomon*, 136 F.4th at 55.

***7** The Circuit reiterated the point—and reached the same conclusion—just over two months ago, in *Hughes v. National Football League*, No. 24-2656, 2025 WL 1720295 (2d Cir. June 20, 2025) (summary order), where it again affirmed the dismissal of a VPPA claim. The plaintiff there, as in *Solomon*, had alleged that the defendant's website transmitted FIDs and video URLs to Facebook through the Pixel. *Id.* at *2. Rejecting that claim, the Circuit stated that "*Solomon* [had] effectively shut the door for Pixel-based VPPA claims." *Id.* And it denied leave to amend, explaining that the result would be the same "regardless of how the code is later manipulated or used by Facebook," notwithstanding "the ubiquity of Facebook accounts," or the availability of artificial intelligence tools, like ChatGPT, that might facilitate identification. *Id.* at *3. In other words, the Circuit held, the dispositive inquiry is whether the disclosure itself, as transmitted, would be intelligible to an ordinary person.

A month later, Judge Rochon reached the same outcome, applying the recent Circuit authority, The plaintiffs in *Nixon v. Pond5, Inc.* had alleged that the defendant's website disclosed FIDs and video titles through the Pixel, citing code transmission screenshots in their pleadings. No. 24 Civ. 5823, 2025 WL 2030303, at *4–5 (S.D.N.Y. July 21, 2025). Following *Solomon* and *Hughes*, Judge Rochon dismissed the complaint without leave to amend. *Id.* at *6. She reasoned that because "an ordinary person would not plausibly be able to identify Plaintiffs' video-watching habits as a result of the Pixel transmissions," the complaint had not plausibly alleged a disclosure of PII in violation of the VPPA. *Id.* at *5.

This emergent line of authority disposes of the FAC here as well. Like the complaints in *Solomon, Hughes*, and *Nixon*, the FAC alleges that the defendant disclosed users' video-viewing activity to Facebook via the Pixel, specifically by transmitting URLs, FIDs, and video-watching history without their knowledge or consent. FAC ¶¶ 80–81, 106. It includes a screenshot of computer code showing the alleged transmissions to Facebook. *Id.* ¶ 106. It alleges that because a person with the right tools can use an FID to identify a specific Facebook user, the data constitutes PII. *Id.* ¶¶ 81, 95.

Those allegations do not materially differ from those in *Solomon, Hughes*, and *Nixon.* Indeed, the FAC tacitly underscores its inability to satisfy the Second Circuit's ordinary person standard, in its description of the Pixel's disclosures as "technical," *id.* ¶ 33, and embedded in HTTP transmissions inaccessible to ordinary persons, *id.* ¶ 106; and in its reproduction of the screenshot consisting of several

Case: 4:25-cv-00564-CMS Doc. #: 28 Filed: 09/23/25 Page: 22 of 44 PageID #: 205

jumbled lines of code separated by characters, numbers, and letters unintelligible to ordinary persons, *id.* [6] The FAC does not explain how an ordinary person, "with little or no extra effort," could discern that these strings contained Golden's FID or the titles of videos she had watched. *Solomon*, 136 F.4th at 54 (quoting *In re Nickelodeon*, 827 F.3d at 284). At most, the FAC pleads that *Facebook*—through its proprietary systems—could decode these technical strings. But disclosures comprehensible only to Facebook or other sophisticated actors are not PII. *See Hughes*, 2025 WL 1720295, at *2–3; *Solomon*, 136 F.4th at 54–55. That forecloses Golden's claim.

6 The representative cookie data that includes the user's FID is reproduced, in full, below:
sb=5HftYmuKvY9744LJOIj0fWM8; datr=T3_tYn4t9*l*hm5ShZA4tHvGlR;c_user=100003190670927; dpr=1.5; xs=40%3ADRvBU-LlwPna1g%3A2%3A1662066646%3A-1%3A2997%3A%3AAcXJvfy_fGr6B_A1g1_dAqvC9RXRM8opsbHAJttBkU; fr=0IQFkgt53TAn2Iz3s.AWX6muyZgZBx8fB6ciyIcmWGTPM.BjI00M.U8.AAA.0.0.BjI00M.AWXqh6rFsPI.
*Id.*

The Court accordingly dismisses the VPPA claim. [7] *See, e.g.*, *Hughes*, 2025 WL 1720295, at *3 (affirming dismissal of Pixel-based VPPA claim and declining to remand); *Solomon*, 136 F.4th at 54–55 (affirming dismissal of Pixel-based VPPA claim and denial of leave to amend); *Nixon*, 2025 WL 2030303, at *5–6 (dismissing Pixel-based VPPA claim and denying leave to amend); *see also In re Nickelodeon*, 827 F.3d at 283, 86–90 (affirming dismissal of VPPA claim involving "static digital identifiers," such as "IP address[es] or a digital code in a cookie file"); *Eichenberger*, 876 F.3d at 985–86 (similar, as to Roku device serial numbers).

7 Golden has not sought leave to amend or proposed any amendments to the FAC. The dismissal is thus without leave to further amend. *See Gregory v. ProNAi Therapeutics Inc.*, 757 F. App'x 35, 39 (2d Cir. 2018) (summary order) (affirming denial of leave to amend where plaintiffs sought leave to amend only briefly at the end of an opposition to the motion to dismiss and "included no proposed amendments"); *Hughes*, 2025 WL 1720295, at *3 (despite plaintiff's requests to add greater detail about his Pixel-based claims, explaining that there was "no basis for remanding because amendment would likely be futile").

**B. Unjust Enrichment**

***8** The FAC's unjust enrichment claim is based on the same allegations as its VPPA claim. *See, e.g.*, FAC ¶¶ 150–53. NBCU moves to dismiss it as duplicative, *see* Def. Br. at 16–17, and Golden does not oppose, *see* Def. Reply at 10 ("Plaintiff makes no effort to rebut this argument [and] thus concedes that her unjust enrichment claim should be dismissed as well." (citing *Ventillo v. Falco*, No. 19 Civ. 3664, 2020 WL 7496294, at *12 (S.D.N.Y. Dec. 18, 2020))). NBCU's motion is meritorious.

To allege unjust enrichment under New York law, a plaintiff must plead that the defendant benefitted at the plaintiff's expense, and that equity and good conscience require restitution. *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir, 2006). Unjust enrichment "is not a catchall cause of action to be used when others fail," and is not available where "it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012); *see Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir. 2010) (summary order) ("Unjust enrichment is an equitable claim that is unavailable where an adequate remedy at law exists."). "[E]ven pleaded in the alternative, claims for unjust enrichment will not survive a motion to dismiss where plaintiffs fail to explain how their unjust enrichment claim is not merely duplicative of their other causes of action," *Nelson v. MillerCoors, LLC*, 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017); *see Bourbia v. S.C. Johnson & Son, Inc.*, 375 F. Supp. 3d 454, 466 (S.D.N.Y. 2019) (same); *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 296 (S.D.N.Y. 2015) (same).

Here, Golden does not distinguish her unjust enrichment claim from her VPPA claim. The FAC states that the basis of the unjust enrichment claim is that NBCU wrongfully shared users' PII without their consent. FAC ¶¶ 150–53. That claim effectively replicated the FAC's VPPA allegations, and Golden, by not responding to NBCU's motion to dismiss, has waived any opposition. *See Ventillo*, 2020 WL 7496294, at *12 ("As Plaintiff did not respond to Defendants on this point, he effectively conceded the argument by his failure to respond." (cleaned up)).

The Court accordingly dismisses the unjust enrichment claim as duplicative of the FAC's VPPA claim. *See, e.g.*, *Corsello*, 18 N.Y.3d at 791 (dismissing unjust enrichment claim because, to the extent that the VPPA claim "succeed[s], the unjust enrichment claim is duplicative," and if the

VPPA claim is “defective, an unjust enrichment claim cannot remedy the defects”); *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 168 (S.D.N.Y. 2023) (same); *Gardener v. MeTV*, No. 22 Civ. 5963, 2023 WL 4365901, at *5 (N.D. Ill. July 6, 2023) (same); *see also Lin v. Canada Goose US, Inc.*, No. 21 Civ. 7614, 2022 WL 16926312, at *6 (S.D.N.Y. Nov. 14, 2022) (dismissing unjust enrichment claim as duplicative of statutory claim); *Ohanian v. Apple Inc.*, No. 20 Civ. 5162, 2022 WL 826415, at *4 (S.D.N.Y. Mar. 18, 2022) (same).

## CONCLUSION

For the foregoing reasons, the Court grants NBCU's motion to dismiss the FAC with prejudice. The Clerk of Court is respectfully directed to terminate the motion pending at Docket 57, and to close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 2530689

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

MICHAEL TAINO, individually and on behalf of those similarly situated,

Plaintiff,

- against -

BOW TIE CINEMAS, LLC,

Defendant.

---------------------------------------------------------X

23-CV-5371 (VSB)

**OPINION & ORDER**

Appearances:

Zachary M. Vaughan
Berger Montague PC
Washington, DC

Sophia M. Rios
Berger Montague PC
San Diego, California

Sherrie R. Savett
Barbara A. Podell
Lane L. Vines
Berger Montague PC
Philadelphia, Pennsylvania
*Counsel for Plaintiff*

Christopher A. Rojao
Edward Fanning, Jr.
McCarter & English, LLP
New York, New York
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

Before me is the motion of Defendant Bow Tie Cinemas, LLC ("Bow Tie" or "Defendant") to dismiss the complaint ("Complaint") filed by Plaintiff Michael Taino ("Taino"

or "Plaintiff"). (Doc. 16.) Bow Tie also moves to compel arbitration and stay proceedings pending the completion of the arbitration. (Doc. 14.) For the reasons below, Defendant's motion to compel arbitration is DENIED and Defendant's motion to dismiss is GRANTED.

## I. **Factual Background**[1]

Bow Tie, one of North America's oldest movie theater chains, owns and operates a website, accessible at www.bowtiecinemas.com and www.btmcinemas.com (the "Bow Tie Website") where consumers can view trailers, scan for showtimes, and buy movie tickets. (Doc. 1 ("Compl.") ¶¶ 2–3.) Bow Tie has a loyalty rewards program—the Criterion Club—in which enrolled members earn reward points for box office and concession purchases. (Connelly Decl. ¶ 2.) Plaintiff enrolled in the Criterion Club on June 3, 2021. (*Id.* ¶ 3.) Before activating his or her account, a prospective member must agree to the Criterion Club Terms and Conditions. (*Id.* ¶ 9.) The words "Terms and Conditions" are underlined, depicting a hyperlink:

[1] The following facts are drawn from the allegations set forth in Plaintiff's Class Action Complaint, (the "Complaint"). "On a motion to compel arbitration, the Court accepts as true the allegations in the complaint that relate to the underlying dispute between the parties." *In re Document Techs. Litig.*, No. 17-CV-2405, 2017 WL 2840280, at *1 (S.D.N.Y. Apr. 27, 2017) (citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012)). My reference to these allegations should not be construed as a finding as to their veracity, and I make no such findings. This Opinion & Order also draws from the Declaration of John Connelly in support of the motion to compel arbitration, (Doc. 15-1 ("Connelly Decl.")), and the exhibits attached thereto, (Docs. 15-2–9), and the Declaration of Sophia Rios in opposition to the motion, (Doc. 21 ("Rios Decl.")). Because motions to compel arbitration are evaluated under a standard "'similar to that applicable [to] a motion for summary judgment,'" courts are permitted to consider "materials outside the complaint" in evaluating such motions. *Alfonso v. Maggies Paratransit Corp.*, 203 F. Supp. 3d 244, 247 (E.D.N.Y. 2016) (quoting *Bensadoun v. Jobe–Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). The facts set forth in this section are uncontested unless otherwise noted.

In analyzing the motion to dismiss, however, I rely only on the allegations set forth in the Complaint. (Doc. 1.) I assume the allegations in the Complaint to be true in considering the motion to dismiss pursuant to Federal Rule of Civil Procedure Rule 12(b)(6). *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). My reference to these allegations should not be construed as a finding as to their veracity, and I make no such findings.







(Doc. 15-6 at 3.)

Paragraph nine of the Criterion Club Terms and Conditions includes the following clause: "Arbitration: You agree that any dispute, claim, or controversy arising out of the Terms and Conditions shall be determined by binding arbitration in the state of New York. An award of arbitration may be confirmed in a court of competent jurisdiction." (Doc. 15-7 ¶ 9.) In addition, paragraph five of the Criterion Club Terms and Conditions states the following:

> Bow Tie Cinemas collects personally identifiable information, such as your name, email address, phone number, and physical address, and handles this information in accordance with its Privacy Policy. Our Privacy Policy is hereby incorporated by reference and can be found at www.bowtiecinemas.com/criterion-club/privacy-policy.

(*Id.* ¶ 5; Connelly Decl. ¶ 11.) Crucially, however, clicking the hyperlink, as it existed in June 2021, would direct to a webpage that stated, "404 PAGE NOT FOUND," instead of the Criterion Club Privacy Policy. (Rios Decl. ¶¶ 5–6.)

The bottom of the webpage containing the Criterion Club Terms and Conditions, as it

existed in June 2021, contained two other hyperlinks related to privacy policies. (Rios Decl. ¶ 10.) The first hyperlink, at the bottom-center of the webpage, is labeled "Privacy Policy." (*Id.*) The second hyperlink displayed, at the bottom-right of the webpage beneath the header "Criterion Club", is labeled "Privacy Policy – Criterion Club." (*Id.*)




(*Id.* (arrows added for emphasis).)

As it existed on June 23, 2021, the first hyperlink directed a prospective member to an agreement titled "PRIVACY POLICY." (Rios Decl. ¶ 12.) As it existed on June 23, 2021, the second hyperlink directed a prospective member to an agreement titled "PRIVACY POLICY – CRITERION CLUB." (*Id.* ¶ 13; *see also* Doc. 15-8 ("Criterion Club Privacy Policy").) The agreement found in the first hyperlink, "Privacy Policy," is not the same as the agreement found in the second hyperlink, "Privacy Policy – Criterion Club." (*See* Doc. 21 ¶ 12; *see also* Doc. 20 at 9 ("[B]ut that agreement is not the agreement that Defendant contends was incorporated by reference[.]").) Relevant here, the Criterion Club Privacy Policy informed prospective members

regarding the third-party use of cookies and other tracking technologies, such as the use of web beacons and pixels on its website. (Criterion Club Privacy Policy 2.)

On June 27, 2021, Plaintiff accessed the Bow Tie Website and bought a movie ticket. (Compl. ¶ 46.) At the time Plaintiff purchased his movie ticket on the Bow Tie Website, he was also logged into his Facebook account on the same electronic device. (*Id.* ¶ 47.) When a user uses an Internet browser to log into Facebook, Facebook places several "cookies"—pieces of code placed on a browser by a server that receives and stores information—on the user's browser. (*Id.* ¶¶ 23–24.) One of the cookies that Facebook placed on a user's browser upon login is the "c_user" cookie, which contains the user's Facebook ID number ("FID") and remains on a user's browser as long as they do not log out of Facebook. (*Id.* ¶ 25.) The c_user cookie allows Facebook to identify users when they visit Facebook and track the user's activity across the Internet on the same browser. (*Id.* ¶ 26.) The FID relates to a specific person, unlike, for example, an IP address. (*Id.*) This enables Facebook to match up a user's activity across multiple devices and multiple browsers. (*Id.* ¶¶ 26–27.) Facebook is then able to collect enormous amounts of data and to generate billions of dollars in advertising revenue. (*Id.* ¶ 27.)

Businesses—such as Bow Tie—install the Facebook "pixel" or "web beacon" on their websites. (Compl. ¶¶ 28–29.) When a user visits a website containing the Facebook pixel, the pixel "is programmed to contact the Facebook ad server." (*Id.* ¶ 29.) Because Facebook can identify the Facebook users visiting these websites when the user has an active c_user cookie on their browser, Facebook pixels enable businesses to target advertisements to specific users. (*Id.* ¶¶ 30–32.)

Plaintiff alleges that when he purchased his movie ticket, "Bow Tie shared with Facebook the name of the movie for which Plaintiff purchased a ticket, along with Plaintiff's Facebook ID." (Compl. ¶ 48.) Specifically, Plaintiff claims that computer code, like the one below, is sent to Facebook when a user is logged in to Facebook and uses Bow Tie's website:



```
URL

+ https://www.facebook.com/tr/?id=1937621914216466&ev=SubscribedButtonClick&d
l=https%3A%2F%2Fwww.bowtiecinemas.com%2Fmovie%2F309782%2FVenom-Let-There-Be-
Carnage-Trailer-and-Info&rl=https%3A%2F%2Fwww.bowtiecinemas.com%2F&if=false&
ts=1638264057535&cd[buttonFeatures]=%7B%22classList%22%3A%22btn%20o-btn%20o-
btn--small%22%2C%22destination%22%3A%22%22%2C%22id%22%3A%22%22%2C%22imageUr
l%22%3A%22%22%2C%22innerText%22%3A%22CONTINUE%20CHECKOUT%22%2C%22numChildBut
tons%22%3A0%2C%22tag%22%3A%22button%22%2C%22name%22%3A%22%22%2C%22value%22%3
A%22%22%7D&cd[buttonText]=CONTINUE%20CHECKOUT&cd[formFeatures]=%5B%5D&cd[pag
eFeatures]=%7B%22title%22%3A%22Venom%3A%20Let%20There%20Be%20Carnage%20%7C%2
0Bow%20Tie%20Cinemas%22%7D&cd[parameters]=%5B%5D&sw=1536&sh=864&v=2.9.48&r=s
table&ec=4&o=30&fbp=fb.1.1638263733686.1378033305&it=1638263748850&coo=false
&es=automatic&tm=3&rqm=GET

HEADERS

+ accept:              image/avif,image/webp,image/apng,image/svg+xml,image/*
                       ,*/*;q=0.8
+ accept-encoding:     gzip, deflate, br
+ accept-language:     en-US,en;q=0.9
+ connection:          keep-alive
+ cookie:              sb=19ulYbJ3KXZJ3WqVZz8gdZWo;
                       datr=19ulYWAMjAjNluocOBjZUf01; dpr=1.25;
                       c_user=[redacted]
                       spin=r.1004775812_b.trunk_t.1638259693_s.1_v.2_;
                       xs=49%3AYvE016YkzZBx9w%3A2%3A1638259688%3A-
                       1%3A15160%3A%3AAcUXE8QDHo3tO3GFb1VXuAJvvSCOl_iu6AXyopu
                       5Ag;
                       fr=04bEgOvr9Ty9SUP8M.AWXPXxEleOgdSSIlkApt3cVQFQQ.Bhpet
                       R.Ci.AAA.0.0.BhpetR.AWVhmAh8Xt4
```

(*Id.* ¶ 39 (red boxes and redaction in original).)

### II. <u>Procedural History</u>

Plaintiff filed his class action complaint against Bow Tie on June 23, 2023. (*See* Compl.) The Complaint alleges that Defendant, as a video tape service provider, disclosed consumers' personally identifiable information ("PII") to Facebook in violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, *et seq*. (*Id.* ¶ 6.)

On September 25, 2023, Defendant filed a motion to compel Plaintiff to arbitrate his claims on an individual basis, (Doc. 14), and an accompanying memorandum of law, (Doc. 15 ("MTC Mem."), and declaration, (Doc. 15-1). That same day, Defendant also filed a motion to

dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), (Doc. 16), and an accompanying memorandum of law, (Doc. 17 ("MTD Mem.")). On November 9, 2023, Plaintiff filed his opposition to the motion to compel arbitration, (Doc. 20 ("MTC Opp'n")), as well as an accompanying declaration, (Doc. 21). On the same day, Plaintiff also filed his opposition to the motion to dismiss. (Doc. 22 ("MTD Opp'n").) On December 11, 2023, Defendant filed reply briefs to both the motion to compel arbitration, (Doc. 27 ("MTC Reply")), and motion to dismiss, (Doc. 28 ("MTD Reply")). Defendant filed notices of supplemental authority in support of its motion to dismiss on March 26 and September 11, 2024. (Docs. 29, 30.) After obtaining leave to do so, Plaintiff filed a sur-reply in opposition to the motion to dismiss on September 27, 2024. (Doc. 34.) On October 4, 2024, Defendant filed a response to Plaintiff's sur-reply. (Doc. 35.) The parties then filed notices of supplemental authority, or responses to such notices on April 2, April 8, May 9, and July 1, 2025. (Docs. 36–39.)

## III. Legal Standard

### A. *Motion to Compel Arbitration*

Upon the motion of either party to the agreement, the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, requires courts to compel arbitration in accordance with the terms of an arbitration agreement provided that there is no issue regarding its creation. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citing 9 U.S.C. § 2). "[A] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. A court must therefore first determine: "(1) whether the parties entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement."

*In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011) (citations omitted); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) ("[C]ourts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue.").

Courts must evaluate a motion to compel arbitration pursuant to the FAA under a standard similar to the standard for a summary judgment motion. *See Bensadoun*, 316 F.3d at 175. "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Id.* at 175 (citing 9 U.S.C. § 4). However, the "party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010); *accord Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342–43 (S.D.N.Y. 2014) ("Whether it argues that arbitration is improper because the arbitration agreement is invalid under a defense to contract formation, or asserts that the arbitration contract does not encompass the claims at issue, either way, the resisting party shoulders the burden of proving its defense." (internal quotation marks omitted)). "If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

"[D]espite the strong federal policy favoring arbitration, arbitration remains a creature of contract." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019). Accordingly, "though the presumption in favor of arbitration is strong, the law still requires that parties actually agree to arbitration before it will order them to arbitrate a dispute." *Opals on Ice Lingerie v. Bodylines*

*Inc.*, 320 F.3d 362, 369 (2d Cir. 2003). "[T]he ultimate question of whether the parties agreed to arbitrate is determined by state law." *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002).

Under New York law, the party seeking arbitration bears the burden of proving that a valid arbitration agreement exists, *Am. Centennial Ins. Co. v. Williams*, 649 N.Y.S.2d 190, 191 (2d Dep't 1996), but need only prove the existence of a valid arbitration agreement by a preponderance of the evidence, *see Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venez.*, 991 F.2d 42, 46 (2d Cir. 1993); *see also Torres v. Major Auto. Grp.*, No. 13-CV-0687, 2014 WL 4802985, at *5 (E.D.N.Y. Sept. 25, 2014) (recognizing that despite a requirement of "express, unequivocal agreement" between the parties to an arbitration agreement under New York law, "the Second Circuit has applied the 'ordinary' preponderance of the evidence standard in determining whether parties whose agreements are governed by New York law have agreed to arbitrate" (quoting *Progressive*, 991 F.2d at 46)).

### B. *Rule 12(b)(6) Motion to Dismiss*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237 (2d Cir. 2007). A complaint need not make "detailed factual

allegations," but it must contain more than mere "labels and conclusions or a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Indeed, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

## IV. <u>Discussion</u>

### A. ***Arbitrability of the Dispute***

The parties agree that New York law governs the interpretation of whether a valid arbitration agreement exists between them, and Plaintiff does not dispute that he agreed to the Criterion Club Terms and Conditions, which included an arbitration clause. (*See* MTC Opp'n. 1, 3 (characterizing the Criterion Club Terms and Conditions as "the agreement Plaintiff agreed to"); Doc. 15-7 ¶ 9 ("You agree that any dispute, claim, or controversy arising out of the Terms and Conditions shall be determined by binding arbitration . . .").) Although Bow Tie does not claim that Plaintiff's VPPA claim arises from the Criterion Club Terms and Conditions alone, it argues that Plaintiff's claim is nonetheless within the scope of the arbitration agreement because the Criterion Club Terms and Conditions incorporate by reference a separate policy—the Criterion Club Privacy Policy—which Bow Tie argues "informed Plaintiff of the possible use of third-party cookies and pixels on its website." (MTC Mem. 1.) Thus, because there is no question that the parties entered into an agreement to arbitrate; the only question I must decide is whether the parties' dispute falls within the scope of the arbitration agreement set forth in paragraph nine of the Criterion Club Terms and Conditions.

In arguing that his VPPA claim is outside the scope of the parties' agreement to arbitrate, Plaintiff first argues that he never assented to the Privacy Policy's terms because the Criterion Club Privacy Policy was not incorporated by reference in the Criterion Club Terms and Conditions. (MTC Opp'n 8–11.) I address this argument first.

Paragraph five of the Criterion Club Terms and Conditions states the following:

> Bow Tie Cinemas collects personally identifiable information, such as your name, email address, phone number, and physical address, and handles this information in accordance with its Privacy Policy. Our Privacy Policy is hereby incorporated by reference and can be found at www.bowtiecinemas.com/criterion-club/privacy-policy.

(Doc. 15-7 ¶ 5.) Plaintiff relies principally on the undisputed fact that the hyperlink that purportedly directed Plaintiff to the Criterion Club Privacy Policy was broken. (*See* MTC Opp'n 9; MTC Reply 5 n.1 (conceding that paragraph five's hyperlink includes a "slash" between "criterion club" and "privacy policy," whereas the correct link has a "dash" between "criterion club" and "privacy policy.").) In addition to acknowledging the broken hyperlink, Bow Tie does not dispute Plaintiff's assertion that he never read the Criterion Club Privacy Policy. Instead, Bow Tie argues that an objectively reasonable person would have understood that the Criterion Club Terms and Conditions incorporated the Criterion Club Privacy Policy by reference because that policy was "clearly identified and available." (MTC Reply 5–6.)

a. <u>Applicable Law</u>

"Under New York law, it is well established that contract terms and other agreements may be incorporated by cross-reference." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 104 (2d Cir. 2022). "To determine whether a contract has incorporated a document by reference, courts look to whether a reasonable person would understand the specific document to be incorporated by reference, in other words, an objective standard." *Miller v. Mercuria Energy*

*Trading, Inc.*, 291 F. Supp. 3d 509, 517 (S.D.N.Y. 2018) (citing *Progressive*, 991 F.2d at 47), *aff'd*, 774 F. App'x 714 (2d Cir. 2019). In making this determination, courts generally consider two factors: "(1) whether the allegedly incorporated document is expressly identified and so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt[2] and (2) whether the language incorporating the document clearly communicates that the purpose of the reference is to incorporate the referenced material into the contract." *Volt Elec. NYC Corp. v. A.M.E., Inc.*, 586 F. Supp. 3d 262, 279 (S.D.N.Y. 2022) (citation modified and internal quotation marks omitted). The Second Circuit has made clear that arbitration clauses that were incorporated by reference can be binding on parties. *Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 97 (2d Cir. 2002) ("Indeed, we have specifically found that parties were bound to arbitrate under arbitration clauses they never signed, where those clauses were contained in other documents that were incorporated by reference.").

b. Application

I find that the Criterion Club Terms and Conditions do not incorporate by reference the Criterion Club Privacy Policy by the requisite New York standard of "beyond all reasonable doubt." As an initial matter, paragraph five is plainly sufficient to "clearly communicate[] that

---

[2] As discussed *supra*, the Second Circuit has held that Section 2 of the FAA preempts the standard of proof under New York law in evaluating whether parties have agreed to arbitrate, such that the "ordinary" preponderance of the evidence standard governs. *See Progressive*, 991 F.2d at 46. Although Bow Tie need only prove the existence of the parties' agreement to arbitrate by a preponderance of the evidence under *Progressive*, under New York law, it would have to establish that the referencing document—the Criterion Club Terms and Conditions—identifies the incorporated document—the Criterion Club Privacy Policy—beyond all reasonable doubt. *See Volt*, 586 F. Supp. 3d at 279 (internal quotation marks omitted). "This outcome is obviously in tension with the law regarding burden-of-proof requirements in civil actions." *Torres*, 2014 WL 4802985, at *7 n.10 (citations omitted). However, I need not resolve this dispute because both parties agree that the applicable standard here should be the New York standard of "beyond all reasonable doubt." (*Compare* MTC Opp'n 1, *with* MTC Reply 2–3.) *See Valdez-Mendoza v. Jovani Fashion Ltd.*, No. 15-CV-7261, 2017 WL 519230, at *2 n.1 (E.D.N.Y. Feb. 8, 2017) (applying New York law because "Plaintiffs allege violations of New York labor law and the Defendants cite New York law in their papers"). For the purposes of this Opinion & Order, I therefore apply the New York standard of "beyond all reasonable doubt."

the purpose of the reference is to incorporate" some privacy policy, *Volt*, 586 F. Supp. 3d at 279 (internal quotation marks omitted), as it states, "[o]ur Privacy Policy is hereby incorporated by reference and can be found at http://www.bowtiecinemas.com/criterion-club/privacy-policy," (Doc. 15-7 ¶ 5).

However, the reference to "[o]ur Privacy Policy" cannot be said to refer to the Criterion Club Privacy Policy "beyond all reasonable doubt." Under New York law, "[t]he doctrine of incorporation by reference requires that the paper to be incorporated into a written instrument by reference, must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt." *Chiacchia v. Nat'l Westminster Bank USA*, 507 N.Y.S.2d 888, 889–90 (2d Dep't 1986) (citing *In re Bd. of Comm'rs of Washington Park*, 52 N.Y. 131, 134 (N.Y. 1873)). This requirement "is grounded on the premise that the material to be incorporated is so well known to the contracting parties that a mere reference to it is sufficient." *Id.* at 890. Indeed, this is an "exacting standard." *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 163 (S.D.N.Y. 2014) (quoting *Shark Info. Servs. Corp. v. Crum & Forster Com. Ins.*, 634 N.Y.S.2d 700, 701 (1st Dep't 1995)).

First, it is undisputed that the hyperlink was broken and invalid. (*See* MTC Opp'n 8–9; MTC Reply 5 n.1 (conceding that paragraph five's hyperlink includes a "slash" between "criterion club" and "privacy policy," whereas the correct link has a "dash" between "criterion club" and "privacy policy.").) Therefore, Plaintiff could not use the hyperlink to access the Criterion Club Privacy Policy, which was purportedly incorporated by reference. Clicking the hyperlink in paragraph five directed to a webpage that stated the page could not be found. At this point, assuming Plaintiff did not interpret the webpage as meaning the Criterion Club Privacy Policy did not exist, the Plaintiff would have to engage in a search for the Criterion Club

Privacy Policy. On these facts alone, I find that Bow Tie failed to establish that the Criterion Club Privacy Policy is incorporated by reference beyond all reasonable doubt.

Next, Bow Tie argues that a hyperlink to "Privacy Policy – Criterion Club"—located at the bottom of the Bow Tie Website—clearly identifies the referenced policy. Bow Tie's argument would have been dispositive if it were the only hyperlink to a privacy policy. *See Progressive*, 991 F.2d at 47 n.8 (finding incorporation by reference where there was a "specific reference to a single document directly identified by name"); *see also Volt*, 586 F. Supp. 3d at 279 ("[T]here is no other document potentially incorporated by reference that bears such clear language."); *Laureate Educ., Inc. v. Ins. Co. of the State of Pa.*, No. 11-CV-7175, 2014 WL 1345888, at *7 (S.D.N.Y. Mar. 31, 2014) (finding that a statement of values was incorporated by reference where "[t]here are not multiple statements of values to which the parties may be referring" and there was "no competing reference at issue"). Here, however, there were two privacy policy hyperlinks, both at the bottom of the relevant page. Indeed, the other one states, "Privacy Policy." The text of the Terms and Conditions is also ambiguous since it merely references "[o]ur Privacy Policy," and does not help differentiate between "Privacy Policy" and "Privacy Policy – Criterion Club."[3] A reference to potentially more than one document is not sufficient to meet the high standard of incorporation by reference. *See, e.g.*, *Ward*, 3 F. Supp. 3d at 163 (finding that website's "vague allusion to general classes of documents" did not incorporate those documents); *Jensen v. Cablevision Sys. Corp.*, No. 17-CV-00100, 2017 WL 4325829, at *2 (E.D.N.Y. Sept. 27, 2017) (finding online terms of service not to be incorporated where reference was to a "litany of terms and conditions"). Here, the reference to a "Privacy

[3] Moreover, "a court should construe ambiguous language against the interest of the party who drafted it." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995) (interpreting arbitration clause). Defendant likely drafted the underlying agreement because Plaintiff's only options were to agree or not to agree with it.

Policy," when there are two privacy policies, cannot meet the "exacting standard" of incorporation by reference for a contract. *Shark Info.*, 634 N.Y.S.2d at 701.

Bow Tie finally argues that the specific privacy policy is identified by the URL itself, and that "[a]n objectively reasonable person would understand that the Criterion Club® Terms and Conditions incorporates the Privacy Policy bearing the same name." (MTC Reply 3; *see also* Doc. 15-7 at 2 ("Our Privacy Policy is hereby incorporated by reference and can be found at http://www.bowtiecinemas.com/criterion-club/privacy-policy.").) However, Bow Tie fails to cite to any case law suggesting that it is "beyond all reasonable doubt" that a person would reasonably read every word of the URL itself to identify what document is being referenced. Nor can it. Given the facts that the referenced hyperlink was broken and that there were two alternative Privacy Policies, I cannot find that the Criterion Club Privacy Policy was referenced "beyond all reasonable doubt." Although there may be some indicia that the "Privacy Policy – Criterion Club" may be the relevant policy, I do not find those indicia sufficient to meet the "exacting standard" required for an incorporation by reference. *See Shark Info.*, 634 N.Y.S.2d at 701.

Defendant's motion to compel arbitration hinges on the Criterion Club Privacy Policy being incorporated by reference to the Terms and Conditions. Because I do not find that the Criterion Club Privacy Policy was incorporated by reference beyond all reasonable doubt, Defendant's motion to compel arbitration is DENIED. *See Forge Underwriting Ltd. v. AmTrust Fin. Servs., Inc.*, No. 23-CV-06201, 2023 WL 6890844, at *5–6 (S.D.N.Y. Oct. 19, 2023) (finding arbitration clause not binding where it was not incorporated by reference).

**B. *Motion to Dismiss***

The VPPA provides, in relevant part, that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person." 18 U.S.C. § 2710(b)(1). "To state a claim under the VPPA, a plaintiff must plausibly allege that (1) a video tape service provider (2) knowingly disclosed to any person (3) personally identifiable information concerning her use of the service." *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 44 (2d Cir. 2025) (citations omitted).

Defendant moves to dismiss this action under Federal Rule of Civil Procedure 12(b)(6) under the first and third elements of the VPPA. (*See* MTD Mem. 1–2.) First, Defendant contends that it is not a "video tape service provider" within the meaning of the VPPA. (*Id.*) Second, Defendant argues that the alleged disclosure of information does not constitute "personally identifiable information" within the meaning of the VPPA. (*Id.* at 2.) Because I find that the alleged disclosure here does not constitute PII under the VPPA, the Complaint is dismissed.

In *Solomon*, the Second Circuit joined the Third and Ninth Circuits in interpreting the VPPA to hold that "'personally identifiable information' encompasses information that would allow an ordinary person to identify a consumer's video-watching habits, but not information that only a sophisticated technology company could use to do so." *Solomon*, 136 F.4th at 52. The Second Circuit then applied this "ordinary person" standard to hold that the plaintiff in *Solomon* failed to allege that the disputed disclosure constituted PII under the VPPA because it was "some twenty-nine lines of computer code," which included a video title "interspersed with many characters, numbers, and letters." *Id.* at 54. The Circuit found that it was implausible that

an ordinary person would be able to interpret that language "with little or no extra effort," especially if certain highlighting added to the complaint were removed, to interpret it to be a video title. *Id.* The Second Circuit also found it implausible that "an ordinary person could identify [the plaintiff] through her FID" because it "would be just one phrase embedded in many other lines of code." *Id.* The Court noted that "if the numbers in the exemplar were not redacted, what an individual would see is, for example, a phrase such as 'c_user=123456' or 'c_user=00000000.'" *Id.* Notwithstanding the code including the phrase "www.facebook.com," the Court held that it was "not plausible that an ordinary person, without [a party's] annotation . . . would see the 'c_user' phrase on [the defendant's] servers and conclude that the phrase was a person's FID." *Id.* Finally, the Second Circuit emphasized that the complaint was "devoid of any details about *how* an ordinary person would use an FID to identify" the plaintiff. *Id.* (emphasis in original). The Second Circuit found insufficient the plaintiff's statement that "entering 'facebook.com/[plaintiff's FID]' into any web browser would result in [the plaintiff's] personal Facebook profile." *Id.* at 54–55.

*Solomon* is directly on point and the findings in the case are fatal to Plaintiff's VPPA cause of action. Plaintiff's allegations in his Complaint are essentially identical allegations to the allegations made by the plaintiff in *Solomon*—that Defendant sent Plaintiff's "Facebook ID and the name of the movie they were purchasing tickets for, in a single transmission, to Facebook." (Compl. ¶ 66.) Plaintiff's screenshot includes 12 lines of a long URL of numbers, symbols, and letters. (*Id.* ¶ 39.) Buried in that code is the phrase "Venom-Let-There-Be-Carnage-Trailer-and-Info&rl," which Plaintiff highlights using red boxes as including the name of the movie for which Plaintiff purchased tickets—Venom Let There Be Carnage. However, I find that it is implausible that an ordinary person would be able to interpret this code, without Plaintiff's

emphases with red boxes, "with little or no extra effort," to identify that this was a movie ticket Plaintiff purchased. *Solomon*, 136 F.4th at 54. Even the part of the code that supposedly includes the title of the movie is immediately followed by the phrase, "Trailer-and-Info&rl," which seems to refer to a movie trailer thus further making unclear what the code means. Nor is it plausible that an ordinary person would see the nine-line code of the cookie transmitted—which includes the "c_user" phrase—to cross reference it with the www.facebook.com in the URL section and "conclude that the phrase was a person's FID." *Id.* Finally, Plaintiff's claims that someone could perform "a Google search using the word 'Facebook' plus a given Facebook ID number" to identify the user's Facebook profile, (Compl. ¶ 22), is likewise insufficient to demonstrate that an ordinary person would know what to do with the c_user information to pinpoint an individual's identity. *Cf. Solomon*, 136 F.4th at 54–55 (concluding that FID would not be helpful in identifying an individual). In short, *Solomon* is fatal to Plaintiff's pixel-based claims under the VPPA. *See Hughes v. Nat'l Football League*, No. 24-2656, 2025 WL 1720295, at *2 (2d Cir. June 20, 2025) (summary order) ("*Solomon* effectively shut the door for Pixel-based VPPA claims."). Although Defendant filed notices of supplemental authority on May 9, 2025 regarding *Solomon*, (Doc. 38), and on July 1, 2025 regarding *Hughes*, (Doc. 39), Plaintiff failed to respond and has altogether failed to address either *Solomon* or *Hughes*.

Because Plaintiff fails to support the allegation that the long list of complicated code constitutes PII under the VPPA, Defendant's motion to dismiss is GRANTED.[4]

### C. *Leave to Amend*

In his opposition to the motion to dismiss, Plaintiff requests leave to amend. (MTD

[4] Because I dismiss the Complaint for failure to allege that PII was disclosed in violation of the VPPA, I need not address Defendant's other argument that Defendant was not a "video tape service provider" under the VPPA.

Opp'n 23–24). However, Plaintiff offers no details as to how amendment would cure the Complaint's deficiencies, nor does Plaintiff provide a copy of his proposed amendment. Courts have denied leave to amend where a plaintiff fails to indicate what amendments he intends to make to cure pleading deficiencies. *See Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) ("[D]enial of leave to amend is proper where the request gives no clue as to how the complaint's defects would be cured." (internal quotation marks omitted)); *Romero v. Napoli*, No. 08-CV-8380, 2013 WL 1479308, at *1 (S.D.N.Y. Apr. 1, 2013) (denying leave to amend where "movant fails to file a copy of the proposed amended pleading (or at least a detailed description of the proposed amendments)"). Plaintiff cites *Lamb v. Forbes Media LLC*, No. 22-CV-06319, 2023 WL 6318033 (S.D.N.Y. Sept. 28, 2023) for the proposition that "Courts have uniformly held that FIDs constitute PII under the VPPA." (MTD Opp'n 21.) However, *Lamb* predates *Solomon* and is of no help to Plaintiff. In *Lamb*, the Court granted leave to amend because "an amendment could fortify Plaintiffs' claim to have been subscribers under the VPPA." *Lamb*, 2023 WL 6318033, at *14. The Complaint here does not suffer from the same deficiency as in *Lamb*. Rather, Plaintiff fails to allege that PII was disclosed in violation of the VPPA. Plaintiff offers no explanation how any amendment would rescue his claims after *Solomon*, which "effectively shut the door for Pixel-based VPPA claims." *See Hughes*, 2025 WL 1720295, at *2; *see, e.g.*, *Nixon v. Pond5, Inc.*, No. 24-CV-05823, 2025 WL 2030303, at *5 (S.D.N.Y. July 21, 2025) (dismissing with prejudice similar claims under *Solomon* and *Hughes*); *Golden v. NBCUniversal Media, LLC*, No. 22-CV-9858, 2025 WL 2530689, at *7 (S.D.N.Y. Sept. 3, 2025) (same).

Accordingly, Plaintiff's request for leave to amend the Complaint is DENIED.

## V. <u>Conclusion</u>

For the foregoing reasons, Defendant's motion to compel arbitration is DENIED and Defendant's motion to dismiss is GRANTED. Accordingly, Plaintiff's request to amend is DENIED and his claim is DISMISSED with prejudice.

The Clerk of Court is respectfully directed to terminate Document 14 and Document 16, and to close this case.

SO ORDERED.

Dated: September 16, 2025
New York, New York

Vernon S. Broderick
United States District Judge